UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DAGOBERTO HERNANDEZ-ESPOLINA, )<br>)<br>)<br>Defendant. ) | Case No. 06-CR-0203-CVE |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion to Suppress Illegally Seized Evidence (Dkt. # 17).[1] Defendant seeks to suppress evidence obtained during a police search of his home following his arrest on September 6, 2006. He also claims that police failed to provide a Miranda warning before interrogating him, and he requests that the Court suppress any statements obtained before a warning was given. The Court held a suppression hearing on January 5, 2007.

**I.**

On September 6, 2006, Tulsa Police Department ("TPD") officers Sean Hickey ("Hickey"), Jeff Henderson ("Henderson"), and Frank Khalil ("Khalil"), along with special agent Brandon McFadden ("McFadden") of the Bureau of Alcohol, Tobacco, Firearms & Explosives, were conducting surveillance outside a suspected drug house at 1853 South 139th East Avenue in Tulsa, Oklahoma. Khalil had received a tip from a confidential informant that drugs were being sold out

---

[1] Defendant filed a Supplement to Motion to Suppress Illegally Seized Evidence (Dkt. # 22), attaching a copy of the police report of the events at issue. The supplement was docketed as a motion. Since the Court admitted the report into evidence at the suppression hearing, defendant's motion to supplement (Dkt. # 22) is granted.

of this residence, and he particularly suspected Dagoberto Hernandez ("Hernandez" or "defendant") of selling cocaine, methamphetamine, and marijuana from this location. Khalil was the TPD officer in charge of this investigation and had conducted surveillance at this residence on three or four prior occasions. On September 6, 2006, Hernandez pulled into the driveway in a white 2001 Mercedes and, approximately five minutes later, drove away in a black 1999 Chevy Z-71 truck. Hickey followed Hernandez in an unmarked car as Hernandez drove east on 21st Street, and officers Henderson, Khalil, and McFadden followed Hickey in a separate vehicle. Henderson states that Hernandez was driving 60 mph in a 40 mph zone, and he conducted a traffic stop of Hernandez for speeding.

Prior to this event, Khalil had used the TPD teletype system ("teletype") to check the validity of Hernandez's driver's license, and teletype reported that Hernandez did not have a valid license.[2] Khalil testified that he had advised Henderson of this fact. Henderson approached the driver's side of the vehicle, and Henderson asked Hernandez for his driver's license. Henderson claims that he "was overwhelmed by the strong odor of marijuana" coming from the vehicle even before he asked for defendant's license. Henderson stated that defendant did not have a driver's license,[3] and he

---

[2]  During the hearing, Khalil testified that if he provided teletype with a full name and date of birth, teletype could determine whether defendant had a driver's license in any state. However, he could not remember if he provided enough information to conduct a nationwide driver's license search or simply checked to see if Hernandez had an Oklahoma license.

[3]  This fact was contested at the hearing. Henderson testified that defendant said he did not have a driver's license. Defendant claims that he produced a driver's license that was tossed aside by Henderson, because Henderson believed it was an invalid license. Defendant claims that police have a photocopy of his Kansas driver's license and this license was not expired on September 6, 2006. The government showed at the hearing that that the license was obtained with an admittedly false social security number and was invalid, even if defendant could prove he produced a license during the traffic stop.

2

asked Hernandez to step out of the vehicle. When defendant exited the vehicle, Henderson noticed a burning cigarette on the floor of the driver's side that was emitting a strong odor of marijuana. Henderson moved defendant to the back of the truck, and Khalil remained with Hernandez while Henderson returned to search the vehicle. When Henderson recovered the burning marijuana cigarette, he saw a plastic bag in plain view containing a clear crystal substance that he believed was methamphetamine.[4] After completing his search of defendant's truck, Henderson rejoined Khalil and Hernandez at the back of the truck.

Henderson handcuffed Hernandez and placed him in Henderson's unmarked police car. Henderson sat in the driver's seat, while defendant was placed in the front passenger seat and Khalil sat in the back seat of the Henderson's vehicle. Henderson testified, and Khalil confirmed, that Henderson gave defendant a Miranda warning at that time. At some point, Khalil told defendant that the police knew defendant was selling illegal narcotics and asked defendant where he had come from before the traffic stop. Defendant did not know the address, but said that the house was near 21st and 129th streets and he was living at the house with a friend. Defendant testified that this questioning by Khalil occurred before the arrest, as well as questioning by Khalil to whether there were more drugs at the residence. Khalil claims that he did not interrogate defendant until the search of the vehicle was complete and Henderson had read defendant his Miranda rights. Khalil's report could be read to suggest that he initiated a conversation with defendant before a Miranda warning was given, but Khalil testified that the paragraph regarding the Miranda warning was misplaced in the report, and that Henderson gave the warning before any questioning.

---

[4]     Henderson did not conduct a field test at the scene, but he later confirmed that the substance in the plastic bag was methamphetamine.

3

Khalil asked defendant if there were any more drugs at his home, and defendant responded that he had a "little bit, that's all." Khalil told defendant that police needed to retrieve the drugs before defendant's children could find them or someone was injured. Police claim that defendant consented to a search of his home so that the police could find the rest of the drugs. Defendant also stated that he had a handgun and a rifle in the same room where he hid the drugs. Henderson and Khalil drove defendant back to his home, and Hickey followed in his car. McFadden drove defendant's truck to the home, but arrived several minutes after the other police officers. When Khalil and Henderson arrived at defendant's house, defendant's wife, Crystal Hernandez, pulled into the driveway at the same time. Henderson and Khalil testified that defendant's wife consented to a search of the house, because she was upset at her husband because he refused to stop selling illegal drugs. Defendant testified that police threatened to arrest his wife and coerced her into consenting to a search of the home. Defendant's wife testified that police threatened to arrest her and that her children would be taken away by DHS (Oklahoma Department of Human Services) if she refused to cooperate. Henderson and Khalil denied these allegations, and testified that defendant's wife voluntarily consented to a search of the home.[5]

Police entered the home through the garage door. Defendant's wife testified that there was a security keypad that opened the garage door with a numerical code, and that she provided police a code to open the garage. Khalil testified that he thinks he retrieved a garage door opener from

---

[5] Defendant's wife later executed a written consent form authorizing police to search the home, as well as a written statement.

defendant's truck which Khalil used to open the door.[6] Police raised their weapons when they entered the house to perform a security check, but holstered their weapons upon confirming the area was safe. Defendant was taken to a sofa and kept under surveillance while police searched the home for drugs and weapons. Defendant cooperated with the police, and directed them to the back room he had previously mentioned.

Inside the home, police searched the back room where defendant said he hid drugs and weapons. Police found cocaine, marijuana, methamphetamine, and a .22 caliber rifle in plain view. Police noticed a closet in the room, and found a small tin box containing marijuana. In addition, police found scales, pictures of defendant with known gang members, and other drug-related contraband. Underneath a black leather sofa, police found a .40 caliber semi-automatic handgun hidden inside a white shirt. Police also searched the white Mercedes and found a bag of methamphetamine.[7]

Khalil testified that defendant's wife was cooperative during the search, but was not allowed to leave the home.[8] She asked if she could leave the house to pick up her children from school, but police would not let her leave. Police officers believed it would be dangerous to have children in the home until they located all of the drugs and weapons. With Mrs. Hernandez's help, police

---

[6] It is still unclear how the police opened the garage door because McFadden was driving defendant's truck back to the house, and he did not arrive at the house until police were already inside. The Court finds it more probable that the keypad was used.

[7] Defendant admitted that the Mercedes was payment for a drug sale. Defendant claims that a "white guy" owed him $3000 for three ounces of "ice," and defendant accepted the car as payment.

[8] Mrs. Hernandez hand-wrote a witness statement and police testified that she continuously offered comments about her husband's activities without questioning. The police also permitted her to arrange for a neighbor to pick up her children from school, because it was not possible for her to leave while police were searching the premises.

searched the back yard and noticed two loose bricks on the back patio. Under the first brick, police found three large bags of marijuana. Under the second brick, police found a clear glass jar containing baggies of cocaine and methamphetamine. When police first arrived at the house, they did not have a blank consent form or witness statement form. TPD officer Leland Ashley subsequently arrived on the scene to take photographs, and he had one consent form and one witness statement form that police provided to Mrs. Hernandez.[9]

Defendant and his wife testified at the suppression hearing, and presented a vastly different version of the events. Defendant claims that he was not speeding when Henderson pulled him over, and, immediately after he was pulled over, McFadden handcuffed defendant and stole approximately $600-800 and a gold ring from defendant. He stated that did not consent to a search of his home, and that he repeatedly refused to sign a consent waiver. He claims that once police entered his home they handcuffed defendant to a shower rod in the bathroom. After defendant refused to cooperate with the police, he claims police hit him in the face several times.[10] He testified that he could not see what was happening during the search, because he was kept in the bathroom. Defendant and his wife deny cooperating with police during the search. Defendant's wife denies the government's allegations that she admitted her husband sold illegal narcotics. She claims that police never asked for her consent to search the home, and that her repeated requests to see a search warrant were

---

[9] Henderson testified that he does not routinely carry a consent form or witness statement form with him while he is conducting surveillance. He noted that most searches are performed with a warrant, not consent, but that consent searches usually occur on the spur of the moment and it is not unusual for police to rely on oral consent.

[10] Defendant admitted that he did not have any marks or bruises, that he did not lodge a formal complaint about any alleged police misconduct, and that there is no record to support his claim that police hit him.

ignored. She alleges that any witness statement she provided was coerced. In addition, she claims that police allowed her to leave the home before the search was complete. She claims that when she returned later, the television, DVD player, CD player, liquor, and jewelry had been stolen, and she accuses the police of stealing these items from her home.

Following the investigation and search of defendant's home, the defendant was indicted on six counts: (1) possession of methamphetamine with the intent to distribute; (2) possession of cocaine with the intent to distribute; (3) possession of marijuana with the intent to distribute; (4) possession of two firearms in furtherance of drug trafficking crimes; (5) being an illegal alien in possession of a firearm; and (6) possession of counterfeit identification documents with the purpose of illegally entering or working in the United States.

## II.

Defendant argues that police did not have consent to search his home and, therefore, any evidence seized during the search should be suppressed. Defendant also argues the police interrogated him while he was in custody, but failed to read him a <u>Miranda</u> warning before questioning him. The government responds that defendant and his wife voluntarily consented to a search of his home, and that defendant was read his <u>Miranda</u> rights as soon as he was placed in Henderson's vehicle.

## A.

Defendant denies that he consented to a search of his home, and further claims that his wife's consent was obtained through coercion. Defendant admits that police could detain him for at least two crimes: possession of marijuana and possession of methamphetamine. However, he argues that

police did not have a warrant to search his home, and he points out that he did not sign a consent waiver.

The Fourth Amendment ordinarily prohibits the warrantless search of a person's home as per se unreasonable. Georgia v. Randolph, 126 S. Ct. 1515, 1520 (2006); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Police face a higher burden when entering a person's home, because "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587 (1980). Police can enter a person's home with consent, even if probable cause does not exist, provided that the consent is "freely and voluntarily" given. United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006). The court must review the totality of the circumstances to determine if consent was voluntary. United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994). Even if a criminal defendant is in police custody, he may still give voluntary consent for a search. United States v. Flores, 48 F.3d 467, 469 (10th Cir. 1995). The Tenth Circuit has crafted a two-part test to determine if consent is voluntary:

> First, the government must proffer "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." Furthermore, the government must prove that this consent was given without implied or express duress or coercion.

United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995).

Defendant claims that police illegally interrogated him without reading him a Miranda warning, and that it was during this improper questioning that he allegedly consented to a search of his home. However, defendant's argument is misplaced. A person does not have to be read a Miranda warning to be asked to consent to a search. This could be a factor to determine whether consent was voluntary, but the lack of a Miranda warning by itself does not invalidate defendant's

8

consent for a search of his home. United States v. Rodriguez, 464 F.3d 1072, 1078 (9th Cir. 2006); United States v. Dozal, 173 F.3d 787, 796 (10th Cir. 1999). The Tenth Circuit has held that "consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address. Consenting to a search is not 'evidence of a testimonial or communicative nature' which would require officers to first present a *Miranda* warning." United States v. Rodriguez-Garcia, 983 F.2d 1563, 1568 (10th Cir. 1993). Even if the Court were to assume that defendant was not given a Miranda warning before Khalil questioned him, this does not necessarily vitiate the voluntariness of his consent.[11]

Defendant also suggests the police acted with an improper motive by using the traffic stop to search him for drugs. However, the subjective intentions of the police do not make the traffic stop illegal if police had probable cause to suspect a traffic violation. Whren v. United States, 517 U.S. 806, 813-14 (1996); Scott v. United States, 436 U.S. 128, 137-38 (1978). The Court finds that police had probable cause to stop defendant for a traffic violation, and found a marijuana cigarette in plain view during the traffic stop. Defendant's argument that the police conducted an unlawful search by stopping him for a traffic violation does not show that he was coerced into giving consent.

Defendant argues neither he nor his wife consented to a search of their home, and that evidence gathered during this search should be suppressed. Defendant claims that the police threatened to take his wife to jail if she did not let the police enter and that police threatened to call DHS to take their children if she did not consent to a search. He also argues that he refused to sign

---

[11]   This factual issue will be addressed separately in considering defendant's Miranda argument. See II.B., infra.

a consent waiver, and the government has not presented any evidence to prove that he consented to a search.

The Court finds that the testimony offered by defendant and his wife stretches the boundaries of believability and should not be credited. For example, defendant claims that he repeatedly refused to sign a written consent form. Henderson testified that he did not have a written consent waiver when defendant was arrested, and never attempted to have defendant sign a consent waiver. Defendant admits that he lied when Khalil asked him for his address. He also admits that he used a false social security number to obtain a driver's license, and, therefore, his testimony that he had a valid driver's license is not credible. The Court gives no weight to defendant's testimony that McFadden stole his ring and his money and that other police officers abused defendant during the search of his home. He has not made any type of formal complaint to substantiate these allegations, nor did he mention these acts in his written motion. Defendant has presented no credible evidence to refute the government's claim that he consented to a search of his home; his testimony that he refused to consent is not credible.

Defendant's wife testified to an equally implausible story, and the Court finds the evidence supports a conclusion that she did voluntarily consent to a search of the home. She claims that police forced their way into her home without asking for consent, and dictated the exact language of a witness statement to her. She further claims that police remained in her home after she left, and stole her television, DVD player, and other valuable property. However, her witness statement is consistent with the police report and exonerates her from any criminal liability. She wrote that "[she] told the officers that anything they found, myself and my two kids have nothing to do with it. He keeps his drugs in a back room, but I don't know what kind or where he keeps it." Ex. 2,

Witness Statement, at 1. This type of statement is clearly meant to exonerate Mrs. Hernandez from any wrongdoing, and is consistent with the testimony of police officers suggesting that Mrs. Hernandez disapproved of her husband's alleged illegal activities. The police would not have had any motivation to clear Mrs. Hernandez of illegal activity, nor does the Court find it likely that police would have coerced Mrs. Hernandez to write this type of statement. Mrs. Hernandez's denial of every fact stated in the police report lacks credibility because, even if the police made some factual errors in the report, it is not believable that the police would have manufactured every detail in attempt to gather evidence against defendant. In addition, her allegations that police stole electronic equipment, jewelry, and liquor exceeds all believability, as the evidence shows that the police finished their search and left the home before Mrs. Hernandez left the premises.

The Court finds that the version of the events stated in the police report is consistent with the credible testimony of Henderson, Khalil and McFadden. Although there are certain minor inconsistencies in the testimony, such as how the police opened the garage door, the inconsistencies do not detract from the reliability of the police report as a whole. The government has carried its burden to prove both elements necessary for voluntary consent under <u>Angulo-Fernandez</u>. First, the Court finds that consent was freely and intelligently given by defendant and his wife. Second, there is no credible evidence to support a finding that consent was obtained through coercion. <u>Angulo-Fernandez</u>, 53 F.3d at 1180. The evidence shows that defendant permitted police to search his home and that he assisted police during the search. Even assuming that police did not give defendant a <u>Miranda</u> warning before seeking consent to search, this does not vitiate defendant's freely given consent. The government has established that defendant's wife voluntarily allowed police to enter the home in order to avoid criminal liability for herself and her children, and her testimony to the

contrary is not credible. The search of defendant's home did not violate the Fourth Amendment, and the Court will not suppress any evidence obtained during that search.

**B.**

Defendant argues that police failed to give him a <u>Miranda</u> warning before interrogating him about drugs and weapons that could be located in his home. The government argues that defendant received the warning before questioning. Khalil testified that the placement of paragraph in the police report regarding the <u>Miranda</u> warning was in error, and defendant received the warning before any questioning.

In <u>Miranda v. United States</u>, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Under this rule, the court must suppress a statement, even if voluntary, if a proper warning was not given before police initiated custodial interrogation of a suspect. <u>United States v. Patane</u>, 542 U.S. 630 (2004); <u>United States v. McCurdy</u>, 40 F.3d 1111, 1117 (10th Cir. 1994). However, the fruit of the poisonous tree rule does not apply even if defendant successfully proves that police obtained a statement through custodial interrogation without giving a <u>Miranda</u> warning. <u>United States v. Pettigrew</u>, 468 F.3d 626, 636 (10th Cir. 2006). The <u>Miranda</u> exclusionary rule requires only that the court exclude any "unwarned statement" itself. <u>Oregon v. Elstad</u>, 470 U.S. 298, 307 (1985).

Conflicting testimony was presented at the suppression hearing regarding the timing of the <u>Miranda</u> warning. It is clear that Henderson read defendant a <u>Miranda</u> warning in the police car before police left the traffic stop scene. However, the government's response brief (Dkt. # 21) and

Henderson's testimony at the hearing suggest that Khalil may have briefly talked to defendant before defendant received his Miranda warning. Henderson testified that he did hear Khalil talking to defendant before Henderson could read defendant a Miranda warning. Henderson testified that the only issue about which he remembers Khalil inquiring during this period was defendant's address. Henderson and Khalil both testified that defendant was not asked about selling illegal narcotics or other drugs at the house until after Henderson read defendant his rights. Defendant's testimony conflicts with the police report and the government's testimony at the hearing, because he claims that he was not read his rights at any time on September 6, 2006. The most credible testimony supports a finding that Khalil asked defendant about his address before Henderson read defendant his rights, but the evidence clearly refutes defendant's testimony that he was never given a Miranda warning.

In this case, there is no dispute that the defendant was in custody after police removed him from his truck and placed him in handcuffs. A reasonable person in defendant's circumstances would have believed he was in custody and the government does not argue otherwise. United States v. Rogers, 391 F.3d 1165 (10th Cir. 2004). There is an issue as to whether defendant was interrogated before a warning was given. Defendant argues that Khalil was talking to defendant before Henderson read defendant a Miranda warning, but that does not mean that Khalil was interrogating defendant. Police questioning related to routine matters, such as a person's name and address, will not usually constitute interrogation under Miranda. Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990); United States v. Gaston, 357 F.3d 77, 82 (D.C. Cir. 2004); United States v. Parra, 2 F.3d 1058, 1067-68 (10th Cir. 1993); United States v. Edwards, 885 F.2d 377, 385 (7th Cir. 1989). Unlike Khalil's subsequent questioning concerning defendant's possession of illegal drugs,

any questions regarding defendant's correct address did not require an incriminating response and were not subject to the strictures of Miranda.

The Court finds that defendant's Fifth Amendment rights were not violated, because he has not shown that police improperly interrogated him under Miranda. Defendant was given a Miranda warning before police asked him any questions about his possession of illegal drugs, and the Court will not suppress any statements about his address before the Miranda warning was given.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Illegally Seized Evidence (Dkt. # 17) is **denied**, and Defendant's Supplement to Motion to Suppress Illegally Seized Evidence (Dkt. # 22) is **granted**.

**DATED** this 9th day of January, 2007.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT